**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------- X
                                              :      Civil Action No. 07-7972 (PKC)
IN RE TARRAGON CORPORATION                    :
SECURITIES LITIGATION                         :      ECF Case
                                              :
-------------------------------------------------------------- X
```

**LEAD PLAINTIFF PAUL BERGER'S MEMORANDUM OF LAW**
**IN OPPOSITION TO THE TARRAGON DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

Jeffrey S. Abraham (JA-2946)
Philip T. Taylor (PT-5023)
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, New York 10119
Tel: (212) 279-5050
Fax: (212) 279-3655

**Plaintiff's Lead Counsel**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    The Tarragon Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Defendants Made Materially False or Misleading Statements Concerning the
    Company's Financial Condition and Operational Health . . . . . . . . . . . . . . . . . . . . . . 4

    Tarragon's Stock Price Collapses as the Truth is Revealed . . . . . . . . . . . . . . . . . . . . . 6

    Additional Facts Are Disclosed in Subsequent SEC Filings . . . . . . . . . . . . . . . . . . . . 7

    Defendants Benefit From Tarragon's Misrepresentation of its Financial and
    Operational Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    Plaintiff and Other Investors Were Damaged by Defendants' Wrongdoing . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.    THE COMPLAINT PROPERLY SPECIFIES EACH STATEMENT ALLEGED TO
    HAVE BEEN MATERIALLY FALSE OR MISLEADING AND THE REASONS
    WHY THE STATEMENTS WERE FALSE OR MISLEADING . . . . . . . . . . . . . . . . . 9

    A.    The Complaint Alleges With Specificity the Statements Which Were
        False by Reason of the Failure to Consolidate Ansonia's Results With Those
        of Tarragon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B.    The Complaint Properly Pleads the Statements Which Were Materially
        False or Misleading Through Other Accounting Improprieties . . . . . . . . . . . . . 10

    C.    The Complaint Properly Alleges That the Statements Made in July 2007
        Were Materially False or Misleading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.    SCIENTER HAS BEEN ALLEGED WITH THE REQUIRED PARTICULARITY . . . 12

    A.    The Complaint Properly Alleges Defendants' Motive to Commit Fraud . . . . . . 13

1.     Friedman Was Motivated to Maintain the Value of his Tarragon Stock to Avoid Margin Calls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

2.     Using Tarragon Stock as Currency to Acquire Assets and Retire Debt Served as a Motive to Misstate Results and Omit Material Facts . . . . . . 14

3.     Defendants' Desire to Maintain Compliance With Financial Covenants Serves as an Additional Motive . . . . . . . . . . . . . . . . . . . . . . 17

4.     Compensation Being Tied to the Price Level of Tarragon's Stock as Part of a Mix of Facts Establishes a Motive to Commit Fraud . . . . . . 17

B.     The Complaint Properly Alleges Defendants' Conscious Disregard of Known Facts or Recklessness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

C.     The Inference of Scienter from the Complaint's Allegations Viewed Collectively is Cogent and at Least as Compelling as Any Opposing Inference . 22

III.    THE COMPLAINT PROPERLY ALLEGES SECTION 20(a) CLAIMS . . . . . . . . . . . 23

IV.    IF THE COURT DETERMINES THAT ANY ASPECT OF THE COMPLAINT IS INADEQUATELY PLED, LEAVE TO AMEND SHOULD BE GRANTED . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

**Cases**                                                                                            **Page(s)**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Acito v. IMCERA Group*,
    47 F.3d 47 (2d Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Chemical Bank v. Arthur Andersen & Co.*,
    726 F.2d 930 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Cosmas v. Hasset*,
    886 F.2d 8 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Duncan v. Pencer*,
    94 CV 0321, 1996 U.S. Dist. LEXIS 401 (S.D.N.Y. Jan. 18, 1996) . . . . . . . . . . . . . . 15

*Eminence Capital, LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Feder v. Martin-Marietta Corp.*,
    406 F.2d 260 (2d Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Gabriel Capital L.P. v. NatWest Fin., Inc.*,
    122 F. Supp. 2d 407 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Goldberg v. Meridor*,
    567 F.3d 209 (2d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*,
    381 F. Supp. 2d 192 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Atlas Air Worldwide Holdings, Inc., Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

*In re Bayou Hedge Fund Litig.*,
    534 F. Supp. 2d 405 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

*In re Carter-Wallace, Inc. Sec. Litig.*,
    150 F.3d 153 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Global Crossing, Ltd. Sec. Litig.*,
    471 F. Supp. 2d 338 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 11

*In re Health Management Inc. Sec. Litig.*,
    970 F. Supp. 192 (E.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Initial Public Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re Intelligroup Sec. Litig.*,
    527 F. Supp. 2d 262 (D.N.J. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Leslie Fay Cos. Sec. Litig.*,
    835 F. Supp. 167 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Livent, Inc. Sec. Litig.*,
    78 F. Supp. 2d 194 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Prudential Secs., Inc. Ltd. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Sonus Networks, Inc. Sec. Litig.*,
    2006 U.S. Dist. LEXIS 28272 (D. Mass. May 10, 2006) . . . . . . . . . . . . . . . . . . . . . 21

*In re Sonus Networks, Inc. Sec. Litig.*,
    247 F.R.D. 244 (D. Mass. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Telxon Corp. Sec. Litig.*,
    133 F. Supp. 2d 1010 (N.D. Oh. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

*In re Time Warner Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 15

*In re U.S. Aggregates, Inc. Sec. Litig.*,
    235 F. Supp. 2d 1063 (N.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Van der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 15

*In re Veeco Instruments, Inc., Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Winstar Communications*,
    01 CV 3014, 2006 U.S. Dist. LEXIS 7618 (S.D.N.Y. Feb. 27, 2006) . . . . . . . . . . . . . 19

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 23, 24

*Laperriere v. Vesta Ins. Group, Inc.*,
    2008 U.S. App. LEXIS 9300 (11th Cir. Apr. 30, 2008) . . . . . . . . . . . . . . . . . . . . . . . . 24

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Kramer v. Time Warner, Inc.*,
    937 F.2d 767, 774 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    513 F.3d 702 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Oliver Schools, Inc. v. Foley*,
    930 F.2d 248 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Rehm v. Eagle Fin. Corp.*,
    954 F. Supp. 1246 (N.D. Ill. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,*
    75 F.3d 801 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*SEC v. First Jersey Secs., Inc.,*
    101 F.3d 1450 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Stevelman v. Alias Research Inc.,*
    174 F.3d 79 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    __ U.S. __, 127 S. Ct. 2499 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Virginia Bankshares v. Sandberg,*
    501 U.S. 1083 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Wilson v. Bernstock,*
    195 F. Supp. 2d 619 (D.N.J. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Statutes and Rules**

15 U.S.C. §78u-4(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

15 U.S.C. §78u-4(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

17 C.F.R. §210.10-01(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

17 C.F.R. §210.4-01(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

17 C.F.R. §240.12b-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8

Fed. R. Evid. 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Lead Plaintiff Paul Berger ("Plaintiff"), by his attorneys, respectfully submits this memorandum of law in opposition to the motion to dismiss the Amended Class Action Complaint (the "Complaint") filed by defendants Tarragon Corporation ("Tarragon" or the "Company"), William S. Friedman ("Friedman"), Robert P. Rothenberg ("Rothenberg"), Erin D. Pickens ("Pickens") and Beachwold Partners, L.P. ("Beachwold") (collectively referred to herein as the "Tarragon Defendants" or "Defendants").

## PRELIMINARY STATEMENT

Defendants deliberately painted a false picture of the Company's financial and operational health from January 5, 2005 through August 9, 2007 (the "Class Period"). The Class Period begins with a knowing failure to consolidate the financial statements of Ansonia Apartments, L.P. ("Ansonia"), into Tarragon's financial statements. After Defendants corrected that error, Tarragon's financial machinations continued with the Company prematurely recognizing revenues and earnings from uncompleted projects based upon improperly applying the percentage-of-completion method of accounting. Thus, revenues were prematurely recognized despite actual expenditures deviating from project budgets and the Company lacking reasonable assurances that it could collect the relevant revenues after receiving only nominal deposits from proposed future condominium purchasers. At the same time, Defendants falsely represented that Tarragon was successfully executing a strategy to weather the downturn in the real estate market.

This deceit enabled Tarragon to use its common stock as currency for both acquiring assets and retiring debt. In addition, this deceit enabled Tarragon to report continuing compliance with various debt covenants under which the Company operated. Defendants Friedman, Rothenberg and Pickens (collectively referred to herein as the "Individual

Defendants") also benefitted by being able to collect higher bonuses than that which they would have otherwise been entitled. Finally, the deception enabled defendants Friedman and Beachwold to maintain a margin line of credit against which millions of dollars were drawn.

However, after an initial partial revelation of the failure to properly consolidate Ansonia's financial results into those of Tarragon, the house of cards began to collapse as investors correctly interpreted a Public Company Accounting Oversight Board ("PCAOB") report issued with respect to defendant Grant Thornton LLP ("Grant Thornton"), the Company's outside auditors, casting doubt on the reliability of the Company's accounting estimates used in recognizing revenues under the percentage-of-completion method. Similarly, investors began to learn of defaults occurring on pending purchases in the Company's One Hudson Park project which had been recognized as revenues (*i.e.*, money the Company was certain to collect) on a faulty application of the percentage-of-completion method. The final collapse came on August 9, 2007, when Tarragon announced a $125 million impairment charge, an amount greater than all of the Company's previously reported earnings for the entire Class Period.

In response to these facts, Defendants are only able to frame their motion to dismiss by separately isolating each materially misleading statement and each motive for the deceit and arguing that standing alone they are inadequate to plead a strong inference of scienter. However, controlling cases command that the allegations be considered collectively and, when that is done, there can be no doubt that the Complaint satisfies all applicable pleading standards. Therefore, as demonstrated in greater detail below, Defendants' motion to dismiss should be denied in its entirety.

## SUMMARY OF FACTS

### The Tarragon Defendants

Tarragon is a homebuilder and real estate developer. Complaint ¶2. Tarragon's primary source of revenues and profits came from its homebuilding business (Complaint ¶26) which involved condominium conversions, as well as the sale of new developments. Complaint ¶¶43 and 47. The Company also operates a rental division which for a period of time it sought to dispose of through a spin-off transaction. Complaint ¶¶54 and 60.

Defendant Friedman, was the Company's Chairman of the Board, Chief Executive Officer and the beneficial owner of 42.9 % of Tarragon's outstanding common stock. Complaint ¶8; 2006 Proxy Statement (attached as Exhibit A to the Affidavit of Jeffrey S. Abraham ("Abraham Aff.")) at 25.[1] Defendant Rothenberg is the Company's Chief Operating Officer. Complaint ¶9. Defendant Pickens is the Chief Financial Officer of Tarragon. Complaint ¶10.

Defendant Beachwold, an investment arm of Friedman and his family, owned 6.6 % of Tarragon's common stock and participated alongside Friedman in many separate investments made with Tarragon. Complaint ¶12; *see also*, 2006 Proxy Statement (attached as Exhibit A to the Abraham Aff.) at 26. Similarly, defendant Rothenberg separately invested in many projects

---

[1]     This Court may take judicial notice of documents filed with the SEC and other publicly available documents attached as Exhibits to the Abraham Affidavit pursuant to Rule 201 of the Federal Rules of Evidence. *See, e.g., In re Global Crossing, Ltd. Sec. Litig.*, 471 F. Supp. 2d 338, 343 (S.D.N.Y. 2006) ("The Court may also take judicial notice of matters of public record, including the contents of documents required to be filed with the SEC.") (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)); *accord, Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, __ U.S. __, 127 S. Ct. 2499, 2509 (2007) ("courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated by reference, and matters of which a court may take judicial notice.") (citation omitted).

with Tarragon. *See* 2006 Proxy Statement (attached as Exhibit A to the Abraham Aff.) at 10-11.

Tarragon employs substantial financial leverage in its business operations making the Company highly dependent on the ready availability of credit from lending institutions. *See* 2005 Form 10-K (attached as Exhibit B to the Abraham Aff.) at 12. Thus, Tarragon is party to numerous financial covenants in its debt agreements requiring the maintenance of a certain minimum net worth and debt service coverage ratio requirements. *Id.* at 12-13, 56 and 88.

**Defendants Made Materially False or Misleading Statements**
**Concerning the Company's Financial Condition and Operational Health**

Tarragon reported its consolidated financial results in press releases and in filings made with the Securities and Exchange Commission ("SEC"). *E.g.*, Complaint ¶¶20, 22-23. The filings made with the SEC were also accompanied by sworn certifications by defendants Friedman and Pickens certifying, *inter alia*, that they were responsible for maintaining proper financial controls such that they were aware of all material information relating to the Company and that the Company's financial statements were represented in accordance with generally accepted accounting principles ("GAAP"). *E.g.*, Complaint ¶¶ 23(c)-(d).

On August 9, 2006, the Company disclosed that its financial results reported from January 5, 2005 through May 10, 2006 (Complaint ¶¶20, 22, 23, 26, 27, 29, 30 and 32-39), falsely failed to consolidate the results of Ansonia in Tarragon's overall reported financial results. Complaint ¶¶40 and 42. In reaction to this disclosure, the Company's common stock closed down sharply to trade at $10.30 per share, representing a one day decline of $1.67 or about 14%. Complaint ¶41.

On August 24, 2006, Tarragon, in its first publicly reported financial results following the

belated consolidation of Ansonia's financial results with those of the Company, reported a strong increase in revenues together with an increase in income from continuing operations for the fiscal quarter ended June 30, 2006 to $10.7 million. Complaint ¶43. A change in accounting estimates relating to the recognition of revenues based upon the percentage-of-completion methodology enabled the Company to recognize an additional $22.2 million in revenues and gross profit of $6.5 million from the One Hudson Park condominium development earlier than it otherwise would have done under its previous existing policies. Complaint ¶45. Thus, the additional gross profits Tarragon recognized through the change in accounting methodology for One Hudson Park constituted a material portion of Tarragon's net income in the second fiscal quarter of 2006.

The Company continued reporting its operating results in press releases and SEC filings through May 11, 2007. Complaint ¶¶43-45, 47, 48, 49, 51, 54 and 56. Those results included revenues and earnings recognized based upon the percentage-of-completion method. Complaint ¶¶48(d), 52, and 56(c). They also included statements that the Company's financial statements were prepared in accordance with GAAP and certifications made pursuant to the Sarbanes-Oxley Act of 2002 attesting to the adequacy of internal controls necessary to assure the accuracy of the financial statements. Complaint ¶¶48(b), 51(b) and 56(b).[2]

On July 11, 2007, Tarragon issued a press release, also attached as an exhibit to a Form 8-K filed with the SEC that same day, disclosing an increase in net orders for its condominiums albeit at a reduced price. Complaint ¶58. The press release included a quote from defendant

---

[2]    The Company's Form 10-Q for the first fiscal quarter of 2007 was only filed after Tarragon had filed a Form 12b-25 with the SEC stating that the quarterly report would be delayed because Grant Thornton was still in the process of reviewing the financial statements. Complaint ¶55.

Friedman stating that the Company would continue to succeed due to value pricing, promotions and latent demand for quality housing. *Id.*

On July 17, 2007, *Bloomberg* carried a story stating that the PCAOB in a recent report criticized Grant Thornton's actions in auditing and opining on Tarragon's financial statements. Complaint ¶102. The PCAOB Report, dated June 28, 2007, (the "PCAOB Report"), although not noted in the *Bloomberg* article, also stated that there were "unexpected differences in the estimated project completion costs which are key inputs into the determination of the amounts of revenues and profit to be recognized . . . ." *See* PCAOB Report (attached as Exhibit C to the Abraham Aff.) at 5.

**Tarragon's Stock Price Collapses as the Truth is Revealed**

Tarragon common stock began to experience "unusual trading activity . . . "result[ing] in significant price volatility . . . ." Complaint ¶59; *see also*, Complaint ¶97 (price dropped $4 per share). In reaction to these events, Tarragon issued a press release stating that "there has been no material change to the Company's business outlook, financial position or any other aspect of its business that would account for such trading activity." Complaint ¶59.

Then, on August 9, 2007, Tarragon issued a press release announcing, among other things that, the filing of its Form 10-Q for the fiscal quarter ended June 30, 2007 would be delayed and the Company expected to take property impairment charges in excess of $125 million. Complaint ¶¶60-61. This $125 million impairment exceeded all of Tarragon's reported earnings from the beginning of the Class Period.[3] In reaction to this disclosure, Tarragon's stock

---

[3]    Tarragon's net incomes for the 2005 and 2006 fiscals years were respectively $10,182,000 and $87,599,000, for a two year total of $97,781,000. *See* 2006 Form 10-K (attached as Exhibit D to the Abraham Aff.) at 74. The Company reported a net loss of

collapsed $1.88 per share to close at $0.94 per share, a one day decline of approximately 67%.

Complaint ¶62. The price collapse was accompanied by massive insider selling by defendants

Friedman and Beachwold. *See* Schedule 13D/A dated December 11, 2007 (attached as Exhibit F

to the Abraham Aff.).

## Additional Facts Are Disclosed in Subsequent SEC Filings

On December 24, 2007, Tarragon belatedly filed its Form 10-Q for the fiscal quarter

ended June 30, 2007. Complaint ¶66. In the Form 10-Q, the Company, among other things,

disclosed that: (1) Tarragon had not paid certain loans that had matured since June 30, 2007; (2)

as of June 30, 2007, Tarragon was not in compliance with covenants for debts totaling $342.5

million; and (3) in June 2007, Tarragon had recorded a $17.9 million allowance for estimated

customer defaults on One Hudson Park which had been followed by defaults on units with a total

purchase price of $16.3 million. *Id.* A subsequent Form 10-Q filed by Tarragon disclosed that in

July 2007, the Company began experiencing increased buyer defaults at One Hudson Park.

Complaint ¶67.

The Company's annual report on Form 10-K for the fiscal year ended December 31, 2007

(the "2007 Form 10-K"), was filed with the SEC after Plaintiff filled the Complaint. In the 2007

Form 10-K, Defendants  disclosed that the Company's "internal control over financial reporting

was not effective as of December 31, 2007." 2007 Form 10-K (attached as Exhibit G to the

Abraham Aff.) at 145. The 2007 Form 10-K stated that the Company had not fully integrated or

effectively deployed accounting personnel responsible for complex accounting and financial

_____

$4,621,000 for the first quarter of 2007. *See* 2007 Form 10-Q dated May 11, 2007 (attached as
Exhibit E to the Abraham Aff.) at 5.

reporting requirements. *Id.*

**Defendants Benefit From Tarragon's**
**Misrepresentation of its Financial and Operational Condition**

Defendants' financial machinations enabled Tarragon to use its common stock and

preferred stock as currency to acquire assets and to redeem previously outstanding debt

securities. Complaint ¶¶25, 31, 46 and 98. The elevated price at which Tarragon common stock

traded at also facilitated defendants Friedman's and Beachwold's ability to retain a multi-million

dollar line of credit and for the Individual Defendants to receive additional bonus payments based

upon the price of Tarragon's stock. *Accord*, Schedule 13D/A (attached as Exhibit F to the

Abraham Aff.); 2005 Proxy Statement (attached as Exhibit H to the Abraham Aff.) at 18-19.

**Plaintiff and Other Investors Were Damaged by Defendants' Wrongdoing**

Plaintiff and other public investors in Tarragon (the "Class") purchased the Company's

stock prior to the disclosure of the adverse events causing the severe decline in its price.

Complaint ¶¶1, 2, 97, 107, 111, 113 and 115. Plaintiff is bringing this action on behalf of the

Class to recover money damages for Defendants' wrongdoing. *E.g.*, Complaint ¶¶1, and 121.

## ARGUMENT

In ruling on "a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any

motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual

allegations in the complaint as true." *Tellabs*, 127 S. Ct. at 2509. "The issue is not whether a

plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support

the claims." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 396 (S.D.N.Y.

2005) (quoting cases).

I.    **THE COMPLAINT PROPERLY SPECIFIES EACH STATEMENT ALLEGED TO HAVE BEEN MATERIALLY FALSE OR MISLEADING AND THE REASONS WHY THE STATEMENTS WERE FALSE OR MISLEADING**

Defendants assert that the Complaint fails to comply with the pleading requirements of

Section 21D(b)(1) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

§78u-4(b)(1), by failing to allege which statements were materially misleading and the reasons

why they were false or misleading. Defs. Memo. at 7-14. Defendants are in error.

A.    **The Complaint Alleges With Specificity the Statements Which Were False by Reason of the Failure to Consolidate Ansonia's Results With Those of Tarragon**

Plaintiff has plead with specificity the reasons why the Company's financial statements

which failed to consolidate Ansonia's results were materially false or misleading. *See* Complaint

¶¶68-85. Defendants arguments to the contrary are simply that the Complaint fails to plead

fraudulent intent. However, even assuming *arguendo* that Defendants are correct -- which they

are not, as demonstrated in Point I.B, *infra* -- that in no way means that Plaintiff failed to comply

with the specificity requirements of Section 21D(b)(1).[4]

Defendants assert that there was no misstatement because the underlying information

_____

[4]    Defendants' attempt to separately argue the issue of scienter with respect to the Ansonia allegations runs afoul of the Supreme Court's holding that any analysis of scienter must look at "the facts taken collectively, give rise to a strong inference of scienter, *not whether any individual allegation scrutinized in isolation, meets that standard."* *Tellabs*, 127 S. Ct. at 2509 (emphasis added). Thus, three of the cases cited by Defendants -- *Stevelman v. Alias Research Inc.*, 174 F.3d 79 (2d Cir. 1999); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005); and *In re TwinLab Corp. Sec. Litig.*, 103 F. Supp. 2d 193 (E.D.N.Y. 2000) -- sustained complaints involving GAAP violations where other factors were present evidencing scienter. *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153 (2d Cir. 1998), the only other case relied upon by Defendants in making this argument, did *not* involve a financial restatement or a GAAP violation and the Second Circuit, among other defects in the underlying complaint, found the allegations of inventory overstatement implausible.

-9-

concerning Ansonia was disclosed, however, that information was buried in the notes to

Tarragon's financial statements. Defs. Memo. at 9.[5]  This argument fails as a matter of law.

SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)), provides that financial statements filed with

the SEC which are not prepared in compliance with GAAP are presumed to be materially

misleading and inaccurate, despite footnote or other disclosure.[6]  *Accord*, *Virginia Bankshares v.*

*Sandberg*, 501 U.S. 1083, 1097 (1991) ("not every mixture with the true will neutralize the

deceptive. If it would take a financial analyst to spot the tension between the one and the other,

whatever is misleading will remain materially so, and liability should follow.").[7]

### B.    The Complaint Properly Pleads the Statements Which Were Materially False or Misleading Through Other Accounting Improprieties

Defendants also contend that the Complaint fails to comply with Section 21D(b)(1) with

respect to Tarragon's improper recognition of revenues under the percentage-of-completion

method.  *See* Defs. Memo. at 12-13.  However, even a cursory review demonstrates that the

Complaint alleges the specific statements which were materially false or misleading as a result of

the improper recognition of revenues.  *See* Complaint ¶86 (citing Complaint ¶¶43-45, 47-49, 51-

---

[5]    Those notes to the 2005 Form 10-K run approximately 34 pages.  *See* 2005 Form 10-K (attached as Exhibit B to the Abraham Aff.) at 76-109.

[6]    Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying the most recent annual financial statements. 17 C.F.R. §210.10-01(a).

[7]    Moreover, the disclosures concerning Ansonia in the 2005 Form 10-K are of an abbreviated nature and Defendants have not demonstrated how an investor could independently determine the effect of consolidating its operations with those of Tarragon. Indeed, the 10-K suggests that any such consolidation would not have any meaningful impact by stating that: "we have discontinued recording our share of Ansonia's losses . . . because our investment balance is zero and we have not guaranteed Ansonia's obligations." 2005 Form 10-K at 42.

52, 54 and 56). The Complaint also specifically alleges why the recognition of revenues in that fashion by the Company was improper because Tarragon based that recognition of revenues despite only receiving deposits of 10% or less and not conducting adequate due diligence that the prospective purchasers had the means to complete the purchases. Complaint ¶¶53 and 86-87.[8] [9]

### C.    The Complaint Properly Alleges That the Statements Made in July 2007 Were Materially False or Misleading

Defendants assert that Plaintiff has failed to properly plead a failure to disclose non-compliance with debt covenants and that projections made in July 2007 lacked a reasonable basis in fact. *See* Defs. Memo. at 13-14. These arguments also lack in merit.

As Defendants subsequently acknowledged, Tarragon was not in compliance with its debt covenants as of June 30, 2007. Complaint ¶66(d). This fact certainly contradicted or, at the very least, was inconsistent with Friedman's optimistic statements in a July 11, 2007 press release (Complaint ¶58) and with the statement in a July 25, 2007 press release by Tarragon that "there has been no material change in the Company's business outlook, financial position or any other aspect of its business . . . ." Complaint ¶59.

---

[8]      A further reason why those statements were false is that the budgets and estimates utilized in that process were unreliable and material deviations had emerged long before the actual impairment charges had been taken. *See* PCAOB Report (attached as Exhibit C to the Abraham Aff.) at 5. This is a fact the existence of which the court may take judicial notice. *Accord, Global Crossing*, 471 F. Supp. 2d at 343, *supra*, fn.1.

[9]      Defendants once again seek to conflate their arguments concerning the adequacy of the scienter obligations into the argument as to the adequacy of the pleading under Section 21D(b)(1). *See* Defs. Memo. at 12. They then compound this error with an effort improperly scrutinizing these allegations in isolation. *See* fn.4, *supra* (quoting *Tellabs*, 127 S. Ct. at 2509). Ironically, *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000), cited by Defendants, reversed the dismissal of a securities fraud complaint and found the allegations of sufficient to plead a strong inference of scienter.

Defendants are correct that significant cautionary language could theoretically absolve them from liability for the false projection. *Accord*, *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 101-103 (S.D.N.Y. 2006). However, even assuming *arguendo* that the risk disclosure quoted by Defendants were meaningful -- and they were clearly not -- risk disclosure is inadequate where an existing fact makes the underlying projection (*i.e.*, defaults on loan covenants) misleading. *See, e.g.*, *EVCI*, *supra* (safe harbor issue not appropriate for final resolution at pleading stage where facts were alleged that defendant's risk factor disclosures were not merely hypothetical but were actually happening); *In re Prudential Secs., Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

## II.    SCIENTER HAS BEEN ALLEGED WITH THE REQUIRED PARTICULARITY

Section 21D(b)(2) of the Exchange Act requires that a complaint allege a "strong inference" of scienter. 15 U.S.C. §78u-4(b)(2). However, this standard does not mandate that the inference "be irrefutable, *i.e.*, of the "smoking gun" genre, or even the 'most compelling of competing inferences.'" *Tellabs*, 127 S. Ct. at 2510. Instead, all that is required is that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*, 127 S. Ct. at 2510.

In this Circuit, the requirement that a complaint creates a strong inference of scienter "may be accomplished 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or reckless.'" *BISYS*, 397 F. Supp. 2d at 441 n.52 (quoting

-12-

cases). *Tellabs* also provides that independently of this two-part test courts must evaluate whether "*all* the facts alleged, taken collectively give rise to a strong inference of scienter, *not whether any individual allegations, scrutinized in isolation, meets that standard.*" 127 S. Ct. at 2509 (some emphasis added). Here, Plaintiff satisfies all the applicable tests.

## A.    The Complaint Properly Alleges Defendants' Motive to Commit Fraud

Defendants do not take issue with their having the opportunity to commit the fraud alleged in this action. Instead, Defendants focus their energies on arguing that the Complaint's well-pleading allegations fail to adequately allege the existence of a motive. Defendants, however, are in error.

### 1.    Friedman Was Motivated to Maintain the Value of his Tarragon Stock to Avoid Margin Calls

Inflating a company's stock price to avoid margin calls on a personal loan confers a concrete personal benefit on that defendant sufficient to create a strong inference of scienter. *See, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 416-417 (S.D.N.Y. 2003). In *WorldCom*, the Court found that the financial pressures facing Bernard Ebbers, WorldCom's CEO were "unique and substantial," because WorldCom's stock "provided a crucial underpinning for his complicated personal finances . . . ." *Id.* at 416. Thus, "[i]n order to avoid margin calls from lenders, Ebbers faced a substantial pressure to maintain the price of WorldCom stock that was serving as collateral." *Id.* Based largely on this one factor, Judge Cote concluded that "[t]he benefits to Ebbers of maintaining a fraudulently inflated share price was enormous, unusual, personal and concrete enough to satisfy the pleading requirements for scienter." *Id.* at 417. *Accord*, *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 939 (2d

Cir. 1984) ("a pledge is a sale and purchase of a security under § 10(b)"), *cert. denied*, 469 U.S. 884 (1984).

Here, Friedman's had a substantial amount of money tied up in Tarragon common stock which was, in turn, used as collateral for personal loans. Complaint ¶100. Nor was the pressure of the personal loans taken merely theoretical. Indeed, at the end of the Class Period, Friedman and Beachwold (and Friedman's wife) were forced to sell substantial amounts of Tarragon stock as a result of a margin call. Complaint ¶100; *see also* Schedule 13D/A (attached as Exhibit F to the Abraham Aff.).

Defendants attempt to dodge the bullet by faulting Plaintiff for not pleading the relationship of the value of Tarragon stock owned by Friedman to his overall wealth. However, although Plaintiff is not familiar with any such pleading obligation, he notes that Friedman publicly acknowledged that his financial future was "entwined with that of the Company . . . ." Q4 2006 Tarragon Earnings Conference Call (attached as Exhibit I to the Abraham Aff.) at 8.

Thus, *Kalnit v. Eichler*, 264 F.3d 131, 141 (2d Cir. 2001) and *In re Health Management Inc. Sec. Litig.*, 970 F. Supp. 192, 204 (E.D.N.Y. 1997), relied upon by Defendants, are inapposite to the case at Bar. Here, unlike those cases, it is not mere ownership of the stock which supports the scienter allegations. Instead, it is that fact combined with Friedman's financial well-being entwined with that of Tarragon and the margin loans taken on Tarragon stock which support the motive necessary to evidence a strong inference of scienter.

### 2. Using Tarragon Stock as Currency to Acquire Assets and Retire Debt Served as a Motive to Misstate Results and Omit Material Facts

It is settled law in this Circuit that "in some circumstances, the artificial inflation of stock

-14-

price in the acquisition context may be sufficient for securities fraud scienter." *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000). Here, Tarragon used its stock to acquire the minority interests in two separate partnerships it operated. Complaint ¶¶25 and 46. In addition, over 4.4 million shares of Tarragon stock were used to retire debt through an offer initiated by the Company. Complaint ¶¶28 and 31. These transactions are sufficient to support an inference of scienter. *Accord, Rothman, supra*; *Van Der Moolen*, 405 F. Supp. 2d at 410-411.

Defendants attempt to avoid *Rothman*'s holding by bifurcating the analysis of the two transactions in which Tarragon stock was used as currency to effectuate acquisitions from the issuance of 4.4 million shares to retire debt and then arguing that each of these transactions was an isolated case. However, Defendants' argument fails because all reasonable inferences are to be taken in Plaintiff's favor on a motion to dismiss (*accord, Tellabs*, 127 S. Ct. at 2509) and be "taken collectively . . . ." *Id.* 127 S. Ct. at 2511. Thus, Plaintiff is entitled to the reasonable inference that all three transactions were part of one collective program to utilize Tarragon's stock as currency to effectuate corporate goals. *Accord, Twinlab*, 103 F. Supp. 2d at 206 (E.D.N.Y. 2000) (citing *Duncan v. Pencer*, 94 CV 0321, 1996 U.S. Dist. LEXIS 401 at *48 (S.D.N.Y. Jan. 18, 1996) (Preska, J.)).

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996), the leading Second Circuit case upon which Defendants rely, is not on point. There, the Second Circuit "simply ruled that a company's desire to maintain a high bond or credit rating . . . and minimize the interest rate on debt securities, does not qualify as a sufficient motive for fraud . . . ." *Rothman*, 220 F.3d at 93. Here, as in *Rothman*, the controlling and distinguishing principle is that "not every company has the desire to use its stock to acquire

-15-

another company." *Id.* *Rothman* similarly recognized that *San Leandro*'s holding does not apply where the motive is to issue stock at an artificially inflated price. *Id.* (citing *In re Time Warner Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993) (desire to maintain high stock price to successfully complete rights offering is an adequate motive to plead scienter). Here, the motive is not as mundane as simply maintaining a high credit rating.

Defendants efforts to downplay the significance of the times where Tarragon stock was used to finance acquisitions similarly fails. It matters naught that Tarragon already owned 70% of a partnership prior to acquiring the remaining 30% with its common stock. Instead, the key fact is that using its stock as currency gave Tarragon a motive to commit fraud.

Similarly, that the number of shares issued in the Rohdie transaction was already fixed does not detract from the incentive to maintain a high share price to encourage conversion. Absent an attractive share price the conversion likely would not have taken place. Moreover, a recent SEC filing suggests that some behind the scenes effort to mollify Rohdie by selling him property for a price lower than was otherwise obtainable. *See* 2008 Proxy Statement (attached as Exhibit J to the Abraham Aff.) at 15 ("In October 2007, we sold Kennesaw Farms . . . to an affiliate of Mr. Rohdie for $4.3 million and the assumption of a $1.2 million construction loan. Our board determined that it was in the best interest of Tarragon to accept an offer from Mr. Rohdie rather than pursue an offer of $6.2 million from an unrelated third party purchaser. . . .").[10]

---

[10]    That Tarragon may have re-purchased some of its own shares during the Class Period (*see* Defs. Memo. at 20) does not detract from the scienter allegations. The number of shares sold or used as currency by Tarragon substantially outweighed the number of shares purchased. In addition, occasional re-purchases of stock to maintain a high trading price can be consistent with a motive to commit fraud. *Accord, No. 84 Employer-Teamster Joint Council*

### 3.    Defendants' Desire to Maintain Compliance With Financial Covenants Serves as an Additional Motive

The desire to maintain compliance with debt covenants can serve as an adequate motive to support allegations of scienter. *See, e.g., In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1070-1072 (N.D. Cal. 2002). Indeed, the authorities Defendants cite suggest that such allegations suffice where there is a particularly urgent or desperate need to avoid default. *See, e.g., Wilson v. Bernstock*, 195 F. Supp. 2d 619, 637 (D.N.J. 2002).

Here, the end of the Class Period was accompanied by Tarragon defaulting on numerous financial covenants to which it was a party. Complaint ¶¶65 and 66. Although the precise terms of the financial covenants to which Tarragon was a party are not yet known to Plaintiff, the constant tinkering with the Company's financial results and the massive write-offs at the end of the Class Period suggest strongly that the two are somehow related. *Accord, In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1031 (N.D. Oh. 2000) (nature and number of alleged accounting manipulations coupled with their magnitude adequately plead scienter).

### 4.    Compensation Being Tied to the Price Level of Tarragon's Stock as Part of a Mix of Facts Establishes a Motive to Commit Fraud

A portion of Defendants' compensation was dependent on the trading price of Tarragon's common stock. Complaint ¶99. *See also*, 2005 Proxy Statement (attached as Exhibit H to the Abraham Aff.) at 18-19 ("bonus pool equal to 8% of estimated net pre-tax profits . . . based on our stock price. . . ."). As a matter of economic substance being compensated based upon the price of stock is no different than receiving proceeds from the sale of common stock. Both

---

*Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 928-938 (9th Cir. 2003) (stock repurchase was a factor considered in holding scienter was adequately plead).

involve a direct benefit to the corporate executive from an artificially inflated stock price.

*Accord, Tellabs*, 127 S. Ct. at 2511 ("personal financial gain may weigh heavily in favor of a

scienter allegation.")

      *Acito v. IMCERA Group*, 47 F.3d 47 (2d Cir.1995), the primary Second Circuit case upon

which Defendants rely, only holds that "the existence, ***without more***, of executive compensation

dependent upon stock value does not give rise to a strong inference of scienter." *Id.* at 54

(emphasis added).  However, as demonstrated above, here there are other significant motives

involved making additional executive compensation relevant to the analysis. *Accord, ACA Fin.*

*Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 67 (1st Cir. 2008) (motive of increased salaries "is

relevant -- thought not necessarily sufficient -- to a showing of scienter.").

### B.    The Complaint Properly Alleges Defendants' Conscious Disregard of Known Facts or Recklessness

      Recklessness is sufficient to support a claim under Section 10(b) of the Exchange Act.

*See, e.g., In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 415 n.4 (S.D.N.Y. 2007).

Recklessness is alleged with the requisite specificity where Defendants either "[1] knew facts or

had access to information suggesting that their public statements were not accurate; or [2] failed

to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir.

2000) (internal references omitted).

      Here, it is beyond cavil that Defendants knew about Ansonia's operations and that they

had not been consolidated with Tarragon's financial results.  Tarragon was an 89 % owner of

Ansonia. *See* 2005 Form 10-K (attached as Exhibit B to the Abraham Aff.) at 83.  Similarly,

defendant Rothenberg had an ownership interests in Ansonia. *Id.* at 83-84.  Therefore,

Defendants knew the extent to which Ansonia's operations were intertwined with those of Tarragon and, nonetheless, failed to consolidate those results.

Defendants' contention that the failure to properly report Ansonia's results on a consolidated basis with Tarragon does not evidence recklessness because Grant Thornton, their independent accountant, consented to this accounting treatment does not save them. As an initial matter, Grant Thornton was harshly criticized by the PCAOB for approving the presentation of Tarragon's financial statements. *See* PCAOB Report at 4-5.

However, perhaps more importantly, a company's financial statements are the responsibility of management. "Knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued." *In re Winstar Communications,* 01 CV 3014, 2006 U.S. Dist. LEXIS 7618 at *22 (S.D.N.Y. Feb. 27, 2006) (citing *In re Atlas Air Worldwide Holdings, Inc., Sec. Litig.,* 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004)). High level corporate officers, such as the Individual Defendants, who signed SEC filings containing the Company's financial statements have a duty to familiarize themselves with the facts relevant to the core operations of the Company and the financial reporting of those operations. *Id.* at *22-23. Such officers may not ignore reasonably available data that would indicate that the statements they issued regarding the Company's finances were materially false or misleading. *Id.* at *23 (citing *Atlas Air,* 324 F. Supp. 2d at 491). This is particularly appropriate where, as here, the Individual Defendants all have extensive backgrounds in finance and accounting. *See Telxon,* 133 F. Supp. 2d at 1031 (officers with particularized training and backgrounds should have been on notice that accounting treatments

-19-

would lead to a serious misstatement).[11]

Similarly, the suggestion that Defendants were as surprised as anyone else by the need to take reserves at the end of the Class Period cannot withstand serious scrutiny. The PCAOB Report criticizes Tarragon's cost accounting method which served as the basis for the Company recognizing revenues on the percentage-of-completion method. Specifically, there were "unexpected differences" between the budgets of projects and their actual costs. PCAOB Report at 5. These variances which resulted in the premature recognition of revenues by Tarragon on various projects it was developing were the ultimate source of the Company's need to take the impairment charges leading up to its defaults and implosion in its stock price. Management, *i.e.*, the Individual Defendants, *knew* of these variances because they attempted to provide explanations -- which the PCAOB regarded as inadequate -- to Grant Thornton. *Id*. Thus, Defendants' contention that a subsequent downturn in the real estate market took them by surprise as much as anyone else is simply not credible.

The situation with One Hudson Park falls into this pattern as well. One Hudson Park was an important project for the Company. Friedman attended the building's topping off ceremony and publicly acknowledged the project's importance to the Company. Complaint ¶57; *accord*, Complaint ¶64. Indeed, the project rated specific mentions in the Company's SEC filings. Complaint ¶¶43, 45, 66 and 67. Therefore, given the importance of the project to the Company, it is reasonable to infer that the Individual Defendants knew that persons making deposits on

---

[11]    Defendant Friedman was previously Tarragon's acting Chief Financial Officer. 2006 Proxy Statement (attached as Exhibit A to the Abraham Aff.) at 6. Defendant Rothenberg has served as the managing member of a real estate and investment and management company since 1994 and obtained his M.B.A. from the Harvard Business School in 1984. *Id.* Defendant Pickens is Tarragon's Chief Financial Officer. Complaint ¶10.

units had not demonstrated a sufficient financial commitment to proceed with their purchases

sufficient to employ the percentage-of-completion accounting method. *Accord, Makor Issues &*

*Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 711 (7th Cir. 2008) (product's importance relevant to

an inference of scienter); *Cosmas v. Hasset*, 886 F.2d 8, 13 (2d Cir. 1989) (imputing knowledge

to directors of the removal of a "potentially significant source of income for the company); *Atlas*

*Air*, 324 F. Supp. 2d at 491 (scienter properly alleged where executives should have known about

impairment in value of inventory).

Similarly, Tarragon's $125 million impairment charge was enormous and was more than

all of Tarragon's net income for the Class Period. *See*, fn.4, *supra*. The magnitude of this write-

off, therefore, also supports a strong inference of scienter. *See, e.g., In re Livent, Inc. Sec. Litig.*,

78 F. Supp. 2d 194, 215-217 (S.D.N.Y. 1999) (a strong inference of scienter was supported by

the magnitude of the fraud and the fact that executives signed off on the financial statements)

(citing *In re Leslie Fay Cos. Sec. Litig.*, 835 F. Supp. 167 (S.D.N.Y. 1993)); *Rehm v. Eagle Fin.*

*Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("The more serious the error, the less believable

are defendants protests that they were completely unaware of [the] true financial status and the

stronger is the inference that defendants must have known about the discrepancy.").

Nor can Defendants avoid scienter through admitting to a material weakness in its

internal control. *See* 2007 Form 10-K (attached as Exhibit G to the Abraham Aff.) at 145. To

the contrary, "a failure to maintain sufficient internal controls to avoid fraud is sufficiently

indicative of scienter." *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y.

2006); *accord, In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 342 (D.N.J. 2007) (scienter

may be plead by indicating defendants had reason to doubt the validity of the financials but kept

turning a blind eye to all "red flags")(citations omitted); *In re Sonus Networks, Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 28272 at *68 (D. Mass. May 10, 2006) (failure to maintain internal controls can add to the strength of a case based on other allegations).[12]

Similarly, it is inconceivable that at the time they made their public statements in July 2007 (Complaint ¶¶58-59) Defendants did not know that Tarragon had defaulted on the terms of its financial covenants.  Complaint ¶¶66(b) and 66(d).  Indeed, it is difficult to imagine a more important event in the affairs of a corporation.

### C.    The Inference of Scienter from the Complaint's Allegations Viewed Collectively is Cogent and at Least as Compelling as Any Opposing Inference

Defendants craft their arguments seeking dismissal of the Complaint by separately analyzing the allegations demonstrating conscious disregard of known facts from those concerning motive (*see* Defs. Memo. at 15-21) and Plaintiff has responded accordingly. Although this represents the traditional approach in this Circuit towards analyzing pleadings, the Supreme Court has recently clarified that the correct approach is "whether *all* of the facts taken collectively, give rise to a strong inference of scienter, not whether any individual allegation scrutinized in isolation, meets that standard." *Tellabs*, 127 S. Ct. at 2509.

Here, the Complaint lays out a cogent theory of systematically materially false or misleading statements directed at a goal of enabling Tarragon to use its stock as currency to finance its operations, enabling Defendants Friedman and Beachwold to avoid margin calls on the Tarragon stock they owned and facilitating higher compensation to the Individual Defendants.  Although Defendants have offered certain contrary explanations, the theory set forth

---

[12]    These failures of internal control, of course, also establish that the Sarbanes-Oxley certifications signed during 2007 (Complaint ¶¶51 and 56) were false when made.

by Plaintiff is at least as compelling -- and Plaintiff believes substantially more compelling --
than the hodgepodge of excuses offered by Defendants to explain away or attribute their
misstatements and their profiting from Tarragon's misstatements to mere negligence. *Accord, In
re Sonus Networks, Inc. Sec. Litig.*, 247 F.R.D. 244, 251 n.7 (D. Mass. 2007).

## III.    THE COMPLAINT PROPERLY ALLEGES SECTION 20(a) CLAIMS

To plead a Section 20(a) claim, a plaintiff "must allege: (1) an underlying primary
violation by the controlled person; (2) control over the controlled person; and (3) particularized
facts as to the controlling person's culpable participation in the fraud perpetrated by the
controlled person." *In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.,* 381 F. Supp. 2d 192,
233 (S.D.N.Y. 2004).  Here, Plaintiff has alleged each of those elements.

*First*, Plaintiff has properly alleged a primary violation of §10(b) by Tarragon. *See* Points
I and II above.

*Second*, to allege control "'[a] short, plain statement that gives the defendant fair notice of
the claim that the defendant was a control person is all that is required.'" *Id.* at 234 (citing
*WorldCom,* 294 F. Supp. 2d at 415-16). "Control over a primary violator may be established by
showing that the defendant possessed 'the power to direct or cause the direction of the
management and policies of a person, whether through the ***ownership of voting securities***, by
contract, or otherwise.'" *SEC v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1472-73 (2d Cir. 1996)
(quoting SEC Rule 12b-2, 17 C.F.R. §240.12b-2) (emphasis added).  Here, Friedman's family,
which included defendant Beachwold as an investment arm, collectively owned almost 50% of
Tarragon's stock.  Friedman served on Tarragon's board of directors and in doing so represented
both his interests and those of Beachwold. *Accord, Feder v. Martin-Marietta Corp.*, 406 F.2d

260, 268 (2d Cir. 1968), *cert. denied*, 396 U.S. 1036 (1970).

      *Third*, "[d]istrict courts in the Second Circuit have recently concluded that when a plaintiff pleads control and a primary violation, the plaintiff has pled 'culpable participation.'" *Laperriere v. Vesta Ins. Group, Inc.*, 2008 U.S. App. LEXIS 9300, *17-18 (11th Cir. Apr. 30, 2008) (citing *WorldCom*, 294 F. Supp. 2d at 414-19) (culpable conduct is a pleading requirement that is satisfied when control and a primary violation are pleaded because "culpable participation" refers merely to the level of control required and not to the controlling party's state of mind); *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 308 (S.D.N.Y. 2003) ("whenever the Second Circuit has applied its own test, it has essentially rendered the 'culpable participation' requirement meaningless."); *Gabriel Capital L.P. v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 428-29 (S.D.N.Y. 2000) (noting persuasive authority for the proposition that where a control person knew or should have known that the primary violator was engaged in fraudulent conduct, but did not take steps to prevent the primary violation, there is culpability in the sense required by the Second Circuit.)).

## IV.    IF THE COURT DETERMINES THAT ANY ASPECT OF THE COMPLAINT IS INADEQUATELY PLED, LEAVE TO AMEND SHOULD BE GRANTED

      Finally, Plaintiff respectfully requests leave to amend should the Court find any aspect of Plaintiffs' claims to be inadequately pled. The Second Circuit has held that "[w]here the possibility exists that the defect can be cured and there is no prejudice to the defendant, leave to amend at least once should normally be granted *as a matter of course*." *Oliver Schools, Inc. v. Foley*, 930 F.2d 248, 253 (2d Cir. 1991) (emphasis added).

      The liberality governing requests for leave to amend is particularly appropriate for

complaints subject to the heightened pleading requirements of the federal securities laws. *See, e.g., Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("In this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error."). This is particularly true where, as here, there has been an absence of any judicial scrutiny or other notice to Plaintiffs of any putative defects. *Accord, Goldberg v. Meridor*, 567 F.2d 209, 213 (2d Cir. 1977) (Friendly, J.) (where "nothing had yet been said by the defendants or the judge concerning the alleged inadequacy of his pleading of the federal claim," the plaintiff's request for leave to amend after dismissal "[i]n every real sense . . . thus was seeking a second round, not a third"), *cert. denied*, 434 U.S. 1069 (1978).

## CONCLUSION

Therefore, Defendants' motion to dismiss should be denied in its entirety or in the alternative Plaintiff should be allowed to amend.

Dated: May 16, 2008

**ABRAHAM, FRUCHTER & TWERSKY, LLP**

By: _____
       Jeffrey S. Abraham (JA-2946)
       Philip T. Taylor (PT-5023)
One Penn Plaza, Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax: (212) 279-3655

**Plaintiff's Lead Counsel**

-25-