# EXHIBIT J

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# SCHEDULE 14A
(Rule 14a-101)

Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (Amendment No.   )

Filed by the Registrant

Filed by a Party other than the Registrant

Check the appropriate box:

---

**TARRAGON CORPORATION**

(Name of Registrant as Specified In Its Charter)

---

N/A

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

**Table of Contents**

#  TARRAGON CORPORATION

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
## TO BE HELD THURSDAY, MAY 1, 2008

To Our Stockholders:

We will hold our annual meeting of stockholders on Thursday, May 1, 2008 at 4:00 p.m., local New York City time, at our executive offices located at 423 West 55th Street, 12th Floor, New York, New York 10019. At the meeting, stockholders will consider and take action on the following matters:

1. A proposal to elect seven directors;

2. A proposal to ratify the selection of Grant Thornton LLP as independent registered public accounting firm for the fiscal year ending December 31, 2007;

3. A proposal to adopt the Tarragon Corporation 2008 Omnibus Plan; and

4. Any other business properly brought before the meeting.

You must be a stockholder of record at the close of business on March 10, 2008, to vote at the annual meeting.

It is important that your shares be represented and voted at the annual meeting. Please vote by proxy in one of these ways:

- BY TELEPHONE: Call toll-free **1-800-690-6903** from any touch-tone telephone and follow the instructions;

- BY INTERNET: Go to **http://www.proxyvote.com** and follow the on-screen instructions; or

- BY MAIL: Mark, sign, date and promptly return your proxy card in the postage-paid envelope provided.

You are cordially invited to attend the annual meeting in person. Signing and returning the proxy card or submitting your proxy by Internet or telephone does not affect your right to vote in person if you attend the annual meeting.

Dated: March 31, 2008              By Order of the Board of Directors

                                   /s/ Kathryn Mansfield
                                   Kathryn Mansfield
                                   Executive Vice President,
                                   Secretary and General Counsel

Table of Contents

**Certain Relationships and Related Transactions**

*Policies and Procedures for Approval of Related Persons Transactions*

In considering transactions with related persons, our board of directors requires full disclosure of all material facts concerning the relationship and financial interest of the relevant individuals involved in the transaction. The board then determines whether the transaction is fair to us. If the board makes this determination, the transaction must be approved by a majority of the independent directors entitled to vote on the matter. Our articles of incorporation provide that we will not, directly or indirectly, contract or engage in any transaction with any director, officer or employee or any of their affiliates or associates (as such terms are defined in Rule 12b-2 under the Exchange Act) unless (1) all material facts as to the relationships between or financial interests of the relevant individuals or entities in and to the contract or transaction are disclosed to or are known by our board of directors or the appropriate board committee and (2) our board of directors or the appropriate committee determines that such contract or transaction is fair to Tarragon and simultaneously authorizes or ratifies such contract or transaction by the affirmative vote of a majority of the independent directors entitled to vote on that contract or transaction. The transactions reported in the following paragraphs were all approved by our board of directors in accordance with these policies and procedures, and we believe that the terms of these transactions were at least as advantageous to Tarragon as those we could have obtained from unrelated third parties.

*Transactions with Related Persons*

*Ansonia Relationships*

In 1997, we formed Ansonia Apartments, L.P., a Delaware limited partnership, or Ansonia, in partnership with Ansonia L.L.C., a New York limited liability company. Richard S. Frary, a current member of our board of directors, Robert Rothenberg, our President, Chief Operating Officer and a director, and Eileen Swenson, the President of Tarragon Management, Inc., our wholly owned property management subsidiary, are members in Ansonia L.L.C., which is the limited partner of Ansonia. Our investment in Ansonia was fully recovered in 2002 from distributions to the partners of cash proceeds from property sales, mortgage refinancings, supplemental mortgages and property operations.

In June 2006, Ansonia received $20 million in loan proceeds in connection with the financing of its real estate portfolio through GECC. We received $15,814,890 in cash distributions representing our share of the net proceeds from this transaction. Mr. Rothenberg, Mr. Frary and Ms. Swenson received cash distributions of $677,961, $333,768, and $121,051, respectively, from Ansonia in 2006. There were no cash distributions from Ansonia in 2007.

Ansonia has a secured credit facility with General Electric Credit Corporation. This debt was cross-collateralized and cross-defaulted with a loan on a property owned solely by us in September 2007.

We received property management fees of $2,788,569 in 2007 and $1,840,455 in 2006 from properties owned by Ansonia.

13

**Table of Contents**

*Tarragon Calistoga Relationships*

In November 1999, we formed Tarragon Calistoga L.L.C., a Nevada limited liability company, or Calistoga, with Mr. Frary. Tarragon has an 80% managing member interest in Calistoga, and Mr. Frary holds the remaining 20% member interest. Calistoga owns (1) a 5% member interest in Calistoga Ranch Owners LLC, a California limited liability company, which owns a property development in Napa Valley, California, and (2) a 25% member interest in CR Tarragon Palm Springs L.L.C., a California limited liability company, which owns a Palm Springs, California resort development. Calistoga did not make any distributions to members in 2006 or 2007.

*Friedman Relationships*

With the approval of the independent members of our board of directors, affiliates of William S. Friedman and his wife, Lucy N. Friedman, made a $30 million unsecured revolving line of credit available to us in 2006. In March 2007, this line of credit was increased from $30 million to $40 million. In November 2007, this loan was modified to convert it from a revolving line of credit to a term loan and the term was extended to January 2009. In January 2008, Mr. Friedman sold $10 million of this loan to Robert Rothenberg, our president and chief operating officer and a member of our board of directors, for $6 million, payable $1 million in cash and the balance in a $5 million promissory note made in favor of Mr. Friedman, and the independent members of our board of directors approved the modification of the loan and the execution of two replacement notes in the amounts of $26 million to affiliates of Mr. Friedman and $10 million to Mr. Rothenberg, which we refer to collectively as the affiliate notes.

In 2006 and 2007, interest on this loan was payable at 100 basis points over the 30-day LIBOR or the lowest rate at which credit is offered to us by an institutional lender (5.6% at December 31, 2007). The following table shows the largest aggregate principal amount of indebtedness under the loan in 2007 and 2006, the amounts outstanding at fiscal year end 2007 and 2006, and the principal and interest paid on the indebtedness in 2007 and 2006.

|  | 2007 | 2006 |
|---|---|---|
| Largest aggregate principal amount of indebtedness | $42,351,659 | $30,703,145 |
| Outstanding balance as of December 31 | $36,032,861 | $10,380,976 |
| Principal paid | $29,078,658 | $78,994,235 |
| Interest paid | $ 2,092,677 | $    291,948 |

In an effort to address existing covenant violations under $125 million of subordinated unsecured notes, or the subordinated notes, we entered into an agreement in March 2008 with Messrs. Friedman and Rothenberg and the note holders pursuant to which the aggregate of $36 million in affiliate notes was subordinated to the subordinated notes. In exchange for this subordination, the subordinated note holders have agreed to (1) waive our compliance with the financial covenants applicable to the subordinated notes for a two-year standstill period and (2) grant a 270-day option (or the option) to

14

**Table of Contents**

Mr. Friedman and Mr. Rothenberg to purchase the subordinated notes from the note holders at a discount.

With the approval of the non-management members of our board, in consideration for entering into the subordination agreement and option and agreeing to assign the option to us, we issued to Beachwold Partners, L.P. (a partnership affiliated with Mr. Friedman) and Mr. Rothenberg five-year warrants to purchase 3.5 million shares of our common stock at an exercise price of $2.35, which was the closing price of our common stock on The NASDAQ Global Select Market on the date of issuance. In addition, we entered into amendments to the affiliate notes and related documents which (1) increased the annual rate of interest paid on the affiliate notes to 12.5%, (2) extended the term of the affiliate notes to the later of March 2013 and the second anniversary of the repayment in full of the subordinated unsecured notes and (3) requires mandatory prepayments, after repayment in full of the subordinated notes, out of excess cash receipts. Payments of cash interest on the affiliate notes may not exceed 5% for as long as the affiliate notes remain subject to the subordination agreement, although interest on the affiliate notes is payable in kind at any time.

We received property and asset management fees totaling $92,000 in 2007 and $69,000 in 2006, and loan origination fees of $156,000 in 2006 from real estate partnerships controlled by Mr. Friedman.

*Rohdie Relationships*

In February 2000, we entered into an agreement to acquire the interests of Robert C. Rohdie and his affiliates in ten apartment communities. Mr. Rohdie, our partner in the development of these projects, contributed his equity interests to Tarragon Development Company, LLC, or TDC, in exchange for a preferred interest in TDC of $10 million. Mr. Rohdie served as the president and chief executive officer of Tarragon Development Corporation, our wholly owned subsidiary, from February 2000 through March 31, 2007, and as a member of our board of directors from February 2000 through August 14, 2007.

Mr. Rohdie's preferred interest in TDC earned a guaranteed return until September 30, 2006, when he converted his preferred interest into 668,096 shares of our common stock and 616,667 shares of our 10% cumulative preferred stock in accordance with the terms of the operating agreement of TDC. Mr. Rohdie received distributions of $770,366 in 2006 in payment of his guaranteed return.

In October 2007, we sold Kennesaw Farms, a rental property under development in Gallatin, Tennessee, to an affiliate of Mr. Rohdie for $4.3 million and the assumption of a $1.2 million construction loan. Our board determined that it was in the best interest of Tarragon to accept an offer from Mr. Rohdie rather than pursue an offer of $6.2 million from an unrelated third party purchaser because a sale to Mr. Rohdie was more likely to close and could be closed more expeditiously, since Mr. Rohdie had agreed to waive due diligence and the lender was amenable to Mr. Rohdie's assumption of the construction loan. We also paid Mr. Rohdie fees of $54,000 for consulting services he provided to us in the second quarter of 2007, while still a member of our board of directors.

We believe that the foregoing transactions were at least as advantageous to us and on at least as favorable terms as we could have obtained from unrelated third parties.

**Table of Contents**

compensation is higher for individuals with greater responsibility and greater ability to influence Tarragon's results. Likewise, as position and responsibility increase, a greater portion of the executive's total compensation should be contingent on the achievement of performance objectives.

- Management should focus on the long-term interests of stockholders. Accordingly, a portion of executive compensation must be long-term, at-risk pay in the form of restricted stock, stock options or stock appreciation rights. Equity-based compensation should be higher for persons with higher levels of responsibility, with a greater percentage of their compensation dependent on long-term stock appreciation.

- We must maintain our ability to attract, retain and encourage the development of qualified, capable executives. Total compensation opportunities generally should be competitive with the opportunities offered by organizations of comparable size within the real estate industry. For the positions that are not limited to or directly comparable with the real estate industry, we must reference broader general industry information for similar-sized organizations.

We do not utilize benchmarking to establish executive compensation levels. However, market information regarding pay practices at other companies is sometimes compiled and considered in assessing the reasonableness of compensation, and ensuring that compensation levels remain competitive in the marketplace.

Internal pay equity is also a factor considered in establishing compensation levels for our executive officers. Although we do not have a policy regarding the ratio of total compensation of the chief executive officer to that of our other executive officers, compensation levels are reviewed and compared to ensure that appropriate equity exists.

We seek to maximize the deductibility for tax purposes of all elements of compensation. Section 162(m) of the Code generally disallows a tax deduction for non-qualifying compensation in excess of $1 million paid to any of our named executive officers in any fiscal year. We manage our compensation programs in light of applicable tax provisions, including section 162(m), and may revise compensation plans from time to time to maximize deductibility. However, the compensation committee reserves the right to approve compensation that does not qualify for deduction when and if it deems it to be in the best interests of Tarragon to do so.

We have not adopted equity or other security ownership requirements for our executive officers, but strongly encourage management to align its interests with those of our stockholders. Management beneficially owns approximately 24.8% of the outstanding shares of our common stock as of March 10, 2008.

### *Compensation Committee Processes and Procedures*

The compensation committee operates under a written charter adopted by the board of directors. In 2007 and 2006, the committee consisted of Messrs. Weisbrod (Chairman), Schafran, Schrag and Liebman. Each compensation committee member qualifies as an independent director under the NASDAQ rules.

**Table of Contents**

The primary responsibilities of the compensation committee are to oversee our compensation policies and practices, approve the compensation of our chief executive officer and other senior executive officers, administer our option and incentive plans and authorize option and other stock- or cash-based grants under those plans. The compensation committee has met as often as necessary to perform its duties and responsibilities. It held four meetings in 2007, four meetings in 2006 and has held two meetings to date in 2008. In addition, when appropriate, the compensation committee acts by written consent; the compensation committee acted by written consent three times in 2006. The compensation committee typically meets with our chief executive officer and president, as well as the general counsel and secretary, and when appropriate, the chief financial officer. The compensation committee generally receives and reviews an agenda and related information prepared by management in advance of each meeting.

Compensation decisions are generally made and approved in December and January of each year. Management plays a significant role in the compensation process. Supervisors at all levels conduct annual employee performance evaluations in the fourth quarter. The chief executive officer and/or the president generally conduct performance evaluations of our senior executive officers. In 2007 and 2006, the chief executive officer and president worked closely with the compensation committee to provide background information, relevant performance assessments and individual performance highlights for each of our senior executive officers, and made recommendations to the compensation committee for salary increases, annual bonuses, restricted stock grants and/or options for officers and employees based on such information. In addition, in 2006, the chief executive officer and president provided to the compensation committee a compilation of publicly available compensation information for other companies in our homebuilding peer group for the purposes of evaluating executive compensation awards for our most highly compensated executive officers. This homebuilding peer group consisted of K. Hovnanian Enterprises, Inc., WCI Communities, Inc., Meritage Homes Corporation, Toll Brothers Inc. and Lennar Corporation and is referred to in this proxy statement as the homebuilding peer group. In 2006, the compensation committee approved all of the recommendations of the chief executive officer and president, without modification.

In 2007, we experienced significant liquidity issues caused by the sudden and rapid deterioration in the real estate credit markets and the deterioration of the homebuilding markets in which we operate. In response to these events, we began a program to sell assets in order to reduce negative cash flow, reduce debt and generate sales proceeds for working capital. The board of directors established a special committee to oversee this process. Between August 1 and December 31, 2007, we sold 15 properties, generating net proceeds of $52.1 million. At the same time, we implemented a reduction in workforce to reduce overhead. In December 2007, the compensation committee retained Watson Wyatt Worldwide as a compensation consultant, to assist the compensation committee in three tasks: (1) developing recommendations for compensation of independent board members for special services rendered to the company during the liquidity crisis; (2) establishing a frame-work for awarding 2007 year-end bonuses to executive officers; and (3) creating a retention program for executive officers for 2008 and beyond. Watson Wyatt did not prepare a report, but did provide general recommendations in consultation with management and the compensation committee.

*Elements of Executive Compensation*

Our executive compensation includes three key elements: (1) base salary, (2) annual short-term incentive awards paid in cash or restricted stock and (3) long-term incentive awards in the form